J-A28026-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.C.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.B., MOTHER | : | No. 1827 EDA 2019 |

Appeal from the Decree Entered May 29, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000345-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.B.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.B., MOTHER | : | No. 1835 EDA 2019 |

Appeal from the Decree Entered May 29, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000346-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: M.C.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.B., MOTHER | : | No. 1838 EDA 2019 |

Appeal from the Decree Entered May 29, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000344-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: M.B., A MINOR | : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.B., MOTHER | : | No. 2327 EDA 2019 |

Appeal from the Order Entered August 13, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0002502-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.B., A MINOR | : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.B., MOTHER | : | No. 2328 EDA 2019 |

Appeal from the Order Entered August 13, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002501-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: J.B., A MINOR | : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.B., MOTHER | : | No. 2329 EDA 2019 |

Appeal from the Order Entered August 13, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0002500-2017

J-A28026-19

BEFORE:   PANELLA, P.J., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 28, 2020**

C.B. ("Mother") appeals from the decrees entered May 29, 2019, in the Court of Common Pleas of Philadelphia County, which terminated involuntarily her parental rights to her daughters, J.C.B., born in February 2011, Z.B.B., born in April 2013, and M.C.B., born in November 2014. Mother also appeals from the orders entered August 13, 2019, changing the Children's permanent placement goal to adoption.[1]  After review, we affirm.

Mother and the Children have a lengthy history of involvement with the child welfare system, dating back to 2012 in Delaware County. N.T., 5/29/19, at 58. According to a report prepared by the trauma therapists for Z.B.B. and M.C.B., Mother became homeless in May 2012 after the shelter where she had been residing evicted her due to noncompliance with the shelter's rules. DHS Exhibit 5 at 2. J.C.B. entered foster care in August 2012 and remained there until December 2013, while Z.B.B. entered foster care shortly after her birth in April 2013 and remained there until May 2013. *Id.* Both J.C.B. and Z.B.B. entered foster care for a second time in July 2014, due to Mother's ongoing

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The father of Z.B.B. and M.C.B. is D.B. ("Father"). The father of J.C.B. is unknown, although the record indicates that Father has claimed to be her father as well. The trial court continued the matter as to Father after it terminated Mother's parental rights. It announced that it would terminate Father's parental rights, as well as the parental rights of any unknown father that J.C.B. may have, at the conclusion of the hearing on August 13, 2019.

- 3 -

lack of stable housing and her need to address her mental health issues. *Id.* Finally, M.C.B. entered foster care in July 2015, approximately eight months after her birth. *Id.* The Children remained in foster care through March 2016, when Mother moved to the state of Washington. N.T., 5/29/19, at 59, 147. A Delaware County trial court placed the Children with Father later that year. *Id.* at 58-59. Significantly, Mother had no in-person contact with the Children after her move to Washington. *Id.* at 130. She claimed that she maintained phone contact with the Children while they were residing with Father but that she ended this contact in 2017 because Father was "disrespecting" her. *Id.* at 130-31.

The Children remained in Father's care until he was incarcerated in June 2017. *Id.* at 57-58. Father entrusted the Children to his girlfriend, who cared for the Children for approximately three months before dropping them off at the Philadelphia Department of Human Services ("DHS") in September 2017. *Id.* at 37-39, 62; *see also* Order of Adjudication and Disposition (J.C.B.), 9/27/17, at 2. DHS obtained protective custody of the Children on September 15, 2017. The trial court entered a shelter care order on September 18, 2017, and adjudicated the Children dependent on September 27, 2017.

At the time of the adjudication of dependency, Mother's whereabouts were unknown. N.T., 5/29/19, at 38. Mother finally made contact with DHS in April 2018, after DHS sent a letter to her brother in Washington. *Id.* at 40, 135, 145. Mother exercised sporadic phone contact with the Children starting

in December 2018. *Id.* at 83. However, the trial court suspended Mother's phone contact in February 2019, because of the negative impact that the calls were having on Z.B.B.[2] *Id.* at 44-45, 104-07.

DHS filed petitions to terminate Mother's parental rights to the Children involuntarily, and to change the permanent placement goals of Z.B.B. and M.C.B. to adoption, on May 7, 2019. The trial court conducted a hearing on May 29, 2019, at the conclusion of which it announced that it would terminate Mother's parental rights. The court entered decrees memorializing its decision that same day, as well as a series of permanency review orders. Mother timely filed notices of appeal from both the decrees and orders, along with concise statements of errors complained of on appeal, on June 24, 2019.[3]

Meanwhile, DHS filed a petition to change J.C.B.'s permanent placement goal to adoption on June 17, 2019. The trial court conducted a hearing with respect to all three of the Children on August 13, 2019, after which it entered orders changing the Children's goals. Mother timely filed additional notices of appeal from the goal change orders on August 15, 2019, along with concise statements of errors complained of on appeal.

_____

[2] Mother appealed the trial court's orders suspending her phone contact and this Court affirmed based on mootness on August 28, 2019. *In the Interest of J.B.*, 221 A.3d 322 (Pa. Super. 2019) (unpublished memorandum).

[3] Mother purported to appeal the May 29, 2019 permanency review orders on the basis that they changed the Children's permanent placement goals to adoption. Upon review, however, the orders did not change the Children's goals. Mother ultimately discontinued her appeals.

Mother raises the following claims for our review in her appellate brief filed at 1827, 1835, and 1838 EDA 2019:

> 1. Whether the [t]rial [c]ourt committed an error of law and abuse of discretion by terminating the parental rights of Appellant, Mother, under 23 Pa.C.S.A. § 2511 subsections (a)(1), (a)(2), and (a)(8)?
>
> 2. Whether the [t]rial [c]ourt committed an error of law and abuse of discretion in finding, under 23 Pa.C.S.A. § 2511(b), that termination of [Mother's] parental rights best serves the Child[ren]'s developmental, physical, and emotional needs and welfare?

Mother's Brief at 4 (trial court answers omitted).[4, 5]

We address Mother's challenge to the decrees terminating her parental rights involuntarily mindful of the following standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial

---

[4] Mother filed separate briefs for each of the Children. However, because the substance of the briefs appears identical, we refer simply to Mother's "Brief."

[5] In addition, Mother filed a supplemental brief in support of her appeals at 2327, 2328, and 2329 EDA 2019, in which she challenges the trial court's goal change orders. Even accepting that Mother possesses standing to appeal the August 13, 2019 goal change orders, despite the termination of her parental rights on May 29, 2019, any challenge to those orders would be moot in light of our decision to affirm the termination decrees. *See In the Interest of D.R.-W.*, 2020 Pa. Super. LEXIS 54 at *23 (Pa. Super. filed Jan. 29, 2020) ("[E]ven if Father had not waived his goal change claim, it would be moot in light of our decision to affirm the court's termination decrees."). Accordingly, we affirm the goal change orders.

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. ***See*** 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

. . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), in addition to Section 2511(b), to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate pursuant to Section 2511(a)(2) and (b), which provides as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\*\*\*

23 Pa.C.S.A. § 2511(a)(2), (b).

We begin by considering whether the trial court committed an abuse of discretion by terminating Mother's parental rights to the Children pursuant to Section 2511(a)(2):

. . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In her brief on appeal, Mother contends that DHS failed to present clear and convincing evidence in support of its termination petitions. Mother asserts that she is engaged in mental health treatment, has housing and income, and is caring for two other, younger children successfully. Mother's Brief at 12-13, 17-19. She also asserts that she has been available to DHS and willing to participate in any necessary services to regain custody of the Children. *Id.* at 13, 19. Finally, Mother maintains that DHS failed to make reasonable efforts to reunify her with the Children. *Id.* at 16, 19. She complains that DHS did not provide her with financial assistance so that she could visit the Children in Philadelphia and did not offer her phone contact until December 2018. *Id.* at 16-18.

In its opinion, the trial court summarizes the testimony presented during the termination hearing on May 29, 2019, before concluding that DHS proved its case by clear and convincing evidence. Trial Court Opinion, 8/28/19, at 26-32. The court also directs our attention to its statements on the record at

the conclusion of the hearing. *Id.* at 33-35. The court stated as follows, in relevant part:

> . . . . [Mother] has a residence which she's not sure if she's going to be living at in the future. She has an income which is not secure. But more importantly, she has a gap of contact with these children, which has established an estrangement, to the fact that one child doesn't even know who she is. That's the youngest child, [M.C.B.] And the other two children probably have a very vague recollection of who mother is. So, summing up, taking all the evidence into consideration, I believe that the evidence is clear, convincing, and not credibly refuted, that the sections of the [Adoption] Act . . . have been satisfied. This is a case of abandonment and failure to rectify and remedy any of the issues that brought these children into care.

*Id.* at 35 (quoting N.T., 5/29/19, at 154-55).

Our review of the evidence supports the trial court's determination. As explained above, Mother has a lengthy history of involvement with the child welfare system, dating back to 2012 in Delaware County. N.T., 5/29/19, at 58. Mother testified that she left Philadelphia and moved to Washington in March 2016, while the Children remained in foster care. *Id.* at 141, 147. She claimed that she called the Children on the phone after they began residing with Father, but that she stopped calling in either the beginning of 2017 or September 2017, because Father "got to the point of disrespecting me and telling my kids I didn't care about them, calling me names in front of them, and I felt like they shouldn't be hearing that." *Id.* at 130-31, 142. Notably, on cross-examination, Mother admitted that she did not believe she would ever have contact with the Children again. *Id.* at 142-43. She testified as follows:

[Counsel for DHS]: So, from January of 2017 until 2018, when you found out they were in DHS custody, where did you think they were?

[Mother]: I thought they was [*sic*] with their dad, because the last time we talked, he said he was moving them to South Carolina.

[Counsel for DHS]: And you just never contacted him again?

[Mother]: I tried, but he wouldn't pick up.

[Counsel for DHS] And that was it?  That was the last time you heard from them, he moved with your daughters to South Carolina, and that was the last time you were going to have contact with your kids?

[Mother]: Yes.

\*\*\*

[Guardian *ad litem* ("GAL")]: Now, you only learned that they were in DHS care in April of 2018 because your brother received a letter; is that correct?

[Mother]: Yes.

[GAL]: So, you didn't find out where they were as a result of any efforts you made to find out where they were; is that fair to say?

[Mother]: Yes.

[GAL]: Okay.  So, if you hadn't received that letter, you still wouldn't know where your children are; is that fair to say?

[Mother]: Yes.

*Id.* at 142-45.

In summation, the record reveals that Mother abandoned the Children to move across the country and that she made little if any effort to contact

- 11 -

them afterward. Moreover, Mother would not have contacted the Children at all if not for the fact that they entered foster care for a second time and DHS reached out to her. She has displayed a startling lack of interest and concern in the Children's welfare, which strongly supports the court's determination that she is incapable of providing them with proper parental care.

While Mother testified regarding her alleged viability as a reunification resource during the hearing, emphasizing that she was receiving therapy, and that she obtained income as well as housing, her minimal efforts in this regard after years of noninvolvement in the Children's lives were simply too little, too late. *See id.* at 132, 139, 146, 149. In addition, the record belies Mother's claim that she possesses appropriate housing. The record reveals that Mother shares a two-bedroom apartment in Washington with her boyfriend and their two children. *Id.* at 15-16, 49. This apartment would clearly be inadequate to house the three additional children at issue here. Further, Mother's case manager in Washington,[6] Marissa Hutchings, testified that Mother planned to leave her current apartment due to her poor relationship with her boyfriend. *Id.* at 15-18. It was not clear when Mother would be leaving, where she would go, and whether her new housing would be appropriate for the purposes of reunification with the Children.

---

[6] There is no indication in the record that Mother is involved with the child welfare system in Washington. Ms. Hutchings testified that her organization assists Mother with her mental health needs. N.T., 5/29/19, at 9-12.

As a final matter, we reject Mother's insistence that DHS did not provide her with reasonable reunification services and that the fact that she is caring for her two younger children successfully demonstrates that she can also care for the Children. Our Supreme Court has held that reasonable reunification services are not a prerequisite to the involuntary termination of parental rights pursuant to Section 2511(a)(2). *See In re D.C.D.*, 105 A.3d 662 (Pa. 2014). Likewise, this Court has explained that a parent's ability to care for one child is irrelevant in the termination proceedings regarding a different child. *See A.L.D.*, 797 A.2d at 341 (explaining that the evidence of "Mother's ability to care for her daughter. . . . was irrelevant in the proceedings related to the termination of Mother's parental rights with regard to her son"). Accordingly, we conclude that the trial court did not abuse its discretion or commit an error of law by terminating Mother's parental rights to the Children involuntarily pursuant to Section 2511(a)(2).

We next consider the trial court's decision to terminate Mother's parental rights to the Children pursuant to Section 2511(b):

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

In her brief, Mother fails to develop any argument regarding Section 2511(b). While Mother includes Section 2511(b) in her statement of questions involved, she does not include it in her argument, other than mentioning it in two sentences in a concluding paragraph. *See* Mother's Brief at 21 (asserting that DHS "introduced insufficient evidence as to the impact of termination of parental rights on the Child[ren] and the bond between the Child[ren] and Mother"). Therefore, Mother has waived any challenge to Section 2511(b). *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("[T]his Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority.").

Even if Mother had not waived this claim, we would conclude that it is meritless. The trial court explained its decision regarding Section 2511(b) as follows:

> . . . . On the 2511(b) question, the evidence is clear and convincing that there would be no irreparable harm terminating

[M]other's rights, because there is no parental relationship between [M]other and the [C]hildren. And the testimony by a number of witnesses who have observed the relationship between the [C]hildren and their caretakers and their foster mother and soon to be, hopefully, adopted mothers, is one that shows a strong irredeemable [*sic*] bond, a family bond, a parent bond. The testimony was that it would be in the [C]hildren's best interest to be adopted, and it would be against the [C]hildren's best interest if they were removed from the home of their current caretakers.

Trial Court Opinion, 8/28/19, at 35 (quoting N.T., 5/29/19, at 155-56).

The record supports the trial court's findings. As discussed during our analysis of Section 2511(a)(2), Mother abandoned the Children and moved to Washington in March 2016. At that time, J.C.B. was five years old, Z.B.B. was just under three years old, and M.C.B. was less than two-and-a-half years old. By the time of the hearing on May 29, 2019, J.C.B. was eight years old, Z.B.B. was six years old, and M.C.B. was four-and-a-half years old. During the three-year interim, Mother had minimal contact with the Children. Mother admitted that she did not visit the Children while they were residing with Father. N.T., 5/29/19, at 130. Moreover, she testified inconsistently regarding her phone contact with the Children during that time, claiming at first that she stopped calling the Children shortly before September 2017 and then claiming that she stopped calling in "the beginning of 2017." *Id.* at 131, 142. Regardless, it is undisputed that Mother had no contact with the Children at all beginning in at least September 2017, when they entered foster care for a second time. She testified that she first learned that the Children were in foster care after DHS sent a letter to her brother in April 2018 and that she did not begin receiving

phone contact with the Children until December 2018.[7] *Id.* at 135, 137. Even when Mother had the opportunity to call the Children on the phone, the record reveals that this contact was limited. Mother stated that she had only one call with J.C.B., and two calls with Z.B.B. and M.C.B., before the court suspended her phone contact. *Id.* at 136. Given the lack of contact between Mother and the Children, the record confirms that they do not share a meaningful parental bond.[8] *See Matter of Adoption of M.A.B.*, 166 A.3d 434, 449 (Pa. Super. 2017) ("[A] child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time.").

_____

[7] The reason for this approximately eight-month delay is not clear from the record.

[8] As explained above, the trial court suspended Mother's phone calls with the Children because of the negative impact that the calls were having on Z.B.B. Trauma therapist Dorri Ziai testified that Z.B.B. would react negatively when discussing the phone calls during her therapy sessions. N.T., 5/29/19, at 107. Further, Ms. Ziai testified that Z.B.B. would react negatively even at the mere mention of Mother. *Id.* at 104-05. She explained,

> . . . . When our conversations have addressed her biological family, such as her mother, she's at times even shown very fearful behavior.
>
> So, for example, if her foster mother is in . . . the office, she'll jump into her foster mother's lap, she'll cling to her foster mother, she'll hide her face, she'll fall off the couch, she'll change the subject.

*Id.*

In contrast to the Children's nearly nonexistent relationship with Mother, the record demonstrates that the Children share a significant bond with their respective foster parents. Ms. Cleckley testified that Z.B.B. and M.C.B. reside together in the same foster home, that they share a bond with their foster mother, and that they refer to her as their mother. *Id.* at 50-52. Ms. Cleckley testified that J.C.B. resides in a separate foster home but that she also shares a bond with her foster mother and refers to her as her mother. *Id.* at 54. In addition, the Children's legal counsel presented the testimony of Roya Paller, a former DHS employee with sixteen years of experience, whom the trial court accepted as an expert witness "in the area of discerning children's choices in complicated and delicate situations such as this." *Id.* at 120. Ms. Paller testified that she met with the Children, that they appeared to understand what the word "adoption" meant, and that they all wanted to be adopted.[9] *Id.* at 123-24. Therefore, the trial court did not abuse its discretion or commit an error of law by terminating Mother's parental rights pursuant to Section 2511(b).

Based on the foregoing analysis, we discern no abuse of discretion or error of law in the trial court's decision to terminate Mother's parental rights to the Children involuntarily. Accordingly, we affirm the court's May 29, 2019

---

[9] J.C.B. stated to Ms. Paller that she wanted the foster mother of Z.B.B. and M.C.B. to adopt her, and that she wanted to be able to visit her current foster mother. N.T., 5/29/19, at 124.

decrees. Even accepting that Mother possesses standing to appeal the goal change orders entered August 13, 2019, any challenge to those orders would be moot in light of our decision to affirm the termination decrees. Thus, we affirm the court's goal change orders as well.

Decrees affirmed. Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/28/2020